**In the Matter of HOWDESHELL OF FT. MYERS, Debtor.**

**HOWDESHELL OF FT. MYERS, Plaintiff,**

**v.**

**DUNHAM–BUSH, INC., Defendant.**

**Bankruptcy No. 83–1698.**
**Adv. No. 84–180.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Nov. 6, 1985.

[redacted]

[redacted]

Robert Quinn, Tampa, Fla., for plaintiff.

Francis Cobb, Tampa, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THIS IS a Chapter 11 case and the matter under consideration is a claim of a voidable preference. The claim is presented for this Court's consideration by a Complaint filed by Howdeshell of Ft. Myers, Inc. (Debtor) against Dunham-Bush, Inc. (Defendant).

The claim of the Debtor involves two payments made to the Defendant—one on 5/31/83 in the amount of $12,037.28; the other on June 7, 1983 in the amount of $75,254.47. It is the contention of the Debtor that these payments were made by the Debtor within 90 days of the commencement of this Chapter 11 case; that at the time these payments were made, the Debtor was insolvent; that the payments were made on account of an antecedent debt; and that these payments enabled the Defendant to receive more than it would have received in a Chapter 7 case if the payments had not been made.

Several defenses, including laches and waivers, were asserted by the Defendant, only some of which were seriously urged. The matter was tried basically on the following issues:

(1) the Debtor's insolvency at the time these payments were made;
(2) the existence vel non of new value given by the Defendant after receipt of these payments;
(3) Whether the payment of $75,254.47 on June 7, 1983 did, in fact, constitute a diminution of the assets of the estate;
(4) Whether these payments were intended to be contemporaneously made and were, in fact, contemporaneous;
(5) Whether they were payments made in the ordinary course of business.

The facts relevant to the resolution of these issues, as established at the final evidentiary hearing, can be summarized as follows:

The Debtor is a Florida corporation and was, at the relevant time, engaged in the business of installing air conditioning and heating equipment in connection with large commercial construction projects. The Debtor was and still is a wholly owned subsidiary of Howdeshell, Inc. (Howdeshell) which also is a Debtor seeking relief under Chapter 11, although the estates of these two Debtors have not been consolidated either procedurally or substantively.

The Defendant is a supplier of air conditioning and heating equipment and accessories and sold such items to the Debtor on open account in connection with the Debtor's subcontract on a school construction job known as the LeHigh Acres Middle School project. On February 28, 1983 the Defendant, at the request of the Debtor, shipped various and sundry items to the job site and invoiced the shipment in the total amount of $12,037.28 (Exhibit # 6). The invoice called for payment on 30 day net terms. On March 29, 1983, the Defendant shipped additional materials at the request of the Debtor. This shipment was invoiced out at $75,254.47 and, again, called for a payment in 30 days on a net basis.

It is without dispute that the Debtor paid the February invoice on May 31, 1983, almost 90 days after the receipt of the material, and 60 days after the due date of the

invoice. The second shipment, made on March 29, 1983, was also paid on June 7, 1983, or 60 days after the shipment and 30 days after the due date of the second invoice. While there is no dispute that the May 31, 1983 payment of $12,037.28 was made from the funds of the Debtor, it is equally clear that the second payment on June 7, 1983 was made by a wire transfer by Howdeshell, the parent of the Debtor, and not by this Debtor.

The documentary evidence introduced on the issue of the financial condition of the Debtor at or about the time these payments were made consist of a consolidated financial statement of the Debtor, its parent Howdeshell, and Howdeshell of Sarasota, Inc., a sister corporation of the Debtor dated April 30, 1983 and the Debtors balance sheets for May and June, 1983 (Debtor's Exhibits # 7, # 8, and # 9). It also includes a monthly profit and loss statement of the Debtor's operation as of June 28, 1983 (Debtor's Exhibit # 9) and worksheet of the accountant (Debtor's Exhibit # 15)

The balance sheet of the Debtor dated April 30, 1983 indicates total assets of $1,838,799.03 against total liabilities of $1,667,597.65 or at least theoretically a picture of solvency.

The balance sheet of the Debtor dated May 3, 1983 (Defendant's Exhibit # 9) indicates assets in the amount of $1,813,292.08 against total liabilities of $1,921,047.06 or a clear picture of insolvency.

The consolidated balance sheet of the Debtor, its parent Howdeshell, and its sister corporation Howdeshell of Sarasota, Inc., dated April 30, 1983 (Defendant's Exhibit # 7) indicates total assets of $2,622,-686.00 against total liabilities of $2,232,-520.00 or, again, an equity for stockholders in the amount of $389,966.00. It should be noted, however, that this is a consolidated balance sheet and not the balance sheet of the Debtor alone.

Moreover, the testimony of the accountant indicates that the financial statement contained two substantial errors—a gross underestimation of the cost of completion of jobs in progress and an omission of substantial unpaid accounts payable, which appears on the worksheet. A proper adjustment for these total assets of errors would have indicated a negative picture and insolvency, in that the total liabilities of the Debtor clearly exceeded the aggregate value of its assets at the time relevant to the payments under consideration.

The Debtor filed its petition for relief under Chapter 11 on August 15, 1983. Its schedules submitted indicate total liabilities in the amount of $1,163,083.43 and total assets of $612,401.49, or a clear picture of insolvency. It further appears that at the time these payments were made, the school building project was not yet completed and was not accepted by the School Board. Completion would require the Defendant to perform start-up services on the equipment and the Defendant refused to perform until it was paid on the second invoice. The value of these services was placed at $3,000 to $4,000.

Based on the foregoing, it is the contention of the Debtor that the evidence presented is more than sufficient to permit the conclusion that all operating elements of a voidable preference are present. Thus, the Debtor contends it is entitled to recover both payments, pursuant to § 547 of the Bankruptcy Code, or a money judgment against the Defendant in the amount of $83,291.75.

It should be noted at the outset that the burden of proof to establish each and every element of a preferential transfer is on the trustee and, in this instance, is on the Debtor. *First National Bank of Clinton v. Julian*, 383 F.2d 329, 333 (8th Cir.1967). § 547(f) of the Bankruptcy Code specifically provides that for the purpose of § 547 the debtor is presumed to have been insolvent on and during the 90 days immediately preceeding the date of filing of the petition. In addition to the specific Code provision, the Debtor is aided in discharging his burden concerning insolvency by an inference—where the debtor is shown to be insolvent at a date later than the date of the questioned transfer and it is shown

that the debtor's financial condition did not change during the interim period, insolvency at the prior time may be inferred from the actual insolvency at a later date. *Hassan v. Middlesex County National Bank,* 333 F.2d 838 (1st Cir.1964); *Braunstein v. Massachusetts Bank & Trust Co.,* 443 F.2d 1281 (1st Cir.1971); *Engelkes v. Farmers Co-Op Company,* 194 F.Supp. 319 (N.D. Iowa 1961). Use of this method, known as "retrojection", is acceptable when the financial condition as of the relevant date is not ascertainable. *See Seligson v. N.Y. Produce Exchange,* 394 F.Supp. 125 (S.D. N.Y.1975); *In re Lucasa Int'l Ltd.,* 13 B.R. 596 (Bankr.S.D.N.Y.1981).

■ Applying the foregoing principles to the record in this case, it is clear and this Court is satisfied that the Debtor was insolvent on the two relevant dates. While the documentary evidence introduced may permit the inference of solvency, it is equally consistent with insolvency. Thus, since the evidence is in equilibrium, the Defendant failed to overcome presumption of insolvency provided by § 547(f) of the Bankruptcy Code. The Defendant's contention that this Court should not consider the subsequently discovered error and the omissions in the financial statement and the balance sheet is without basis and cannot be accepted. The Court is not required to accept an erroneous valuation appearing on the Debtor's record, if the error tainted the record. *Chemical Separations Corporation v. Rohm and Haas Company (In re Chemical Separations Corporation),* 38 B.R. 890, 895 (Bankr.E.D.Tenn.1984); *see also Manufacturers and Traders Corp. v. Goldman (In the Matter of Ollag Construction Equipment Corp.),* 578 F.2d 904, 908–09, (2d Cir.1978). It certainly would be improper to ignore apparent estimation errors which caused the accrued cost on work in progress to be shown inaccurately at the time in question. If the increase in cost was not due to unexpected intervening events, it is really not an unanticipated increase but merely an inaccurate estimate of the true cost as it, in fact, existed at the relevant time. It has been held that it is not improper to use hindsight gained from

success or failure of subsequent collection efforts to evaluate accounts receivable. Id. *See also Randall Construction, Inc. Neuger v. Casgar,* 20 B.R. 179, 184 (N.D.Ohio 1981).

■ In the present instance, the claims filed by suppliers against the Debtor clearly established that the Debtor failed to complete or pay its bills on several large construction jobs and has not been able to collect a substantial portion of its accounts receivable (Exhibits # 14 and 15). The contention of the Defendant that this Court should not use the "percentage of completion" method of accounting in valuing the Debtor's assets and liabilities is equally without merit. To disregard the cost of completion and consider only the earned progress billings and earned retainages and not to consider offsetting liabilities attached to the job is totally unrealistic and to do so would present an inaccurate and false financial picture. *See H. Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1352 (8th Cir.1983). Based on the foregoing, this Court is satisfied that at the time relevant, the Debtor was, in fact, insolvent.

This leaves for consideration the remaining elements of a voidable preference and the defenses asserted by the Defendant. There is no doubt that both payments were on account of antecedent debts; they were made during the 90 days immediately proceeding the commencement of this Chapter 11 case. It is equally without dispute that the first payment was made by the Debtor and by the funds of the Debtor. This is not the case, however, concerning the payment on the second invoice. At least, it is without doubt that this payment was made by the parent, Howdeshell by a wire transfer of its own funds.

The Debtor contends that if the direction as to the application of funds is made by the Debtor, rather than by the third party who advanced the funds, the funds are deemed to have been property of the estate, *citing Smyth v. Kaufman,* 114 F.2d

40, 42–43 (2d Cir.1940) in support of its contention.

The Debtor argues that there is no evidence to indicate that the funds advanced by Howdeshell were loaned only upon the condition that Dunham-Bush, specifically, be paid. In fact, the Debtor contends, the evidence discloses that Mr. and Mrs. Howdeshell borrowed funds on their personal residence and deposited those loan proceeds into the Debtor's account on the same date as the second payment was made and that they did so so that the Dunham-Bush account could be paid. The Debtor argues that it could have used the proceeds of either the personal loan or the loan from the parent company to pay Dunham-Bush and use the other to pay creditors in general. The choice was the Debtor's, it argues, and the decision to allocate as it did was merely a fortuitous decision. Since the second payment was made from funds which the Debtor could have used to pay other expenses, it should be deemed to be recoverable as property of the estate under *Smyth.*

The Defendant advances two alternative theories which is contends would dictate a finding that the funds with which it was paid were not property of the estate of the Debtor. First, it contends, and Mr. Howdeshell's testimony suggests, that the personal loan made by the Howdeshells to the Debtor was made for the purpose of covering the second payment to Dunham-Bush so that the LeHigh Acres project could be completed. Those funds, contend the Defendant, were "earmarked" by the Howdeshells to make the second Dunham-Bush payment and, as such, never became property of the estate. In support of that contention, the Defendant cites *In re Vasu Fabrics, Inc.,* 39 B.R. 513, 519 (Bankr.S.D. N.Y.1984); *In re Sun Railings, Inc.,* 5 B.R. 538 (Bankr.S.D.Fla.1980). The Defendant acknowledges, as it must, that there is nothing in the record that explains how the personal loan made to the Debtor found its way from the Debtor's bank account at the Bank of Oldsmar to Howdeshell's bank account at NCNB. Despite that, it contends that it was those "ear-marked" funds that were wired from Howdeshell to Dunham-Bush.

Its alternative contention is that the funds were wired from Howdeshell's own funds and, as such, were never property of the Debtor's estate.

The record establishes without contradiction that the funds were wired from the parent company, Howdeshell, on June 7, 1983 and that the first increment of the Howdeshells personal loan in the amount of $64,837 was not deposited in the Debtor's account until the following day. The second increment of the personal loan, in the amount of $8,000, was deposited on June 9, 1983 in the Debtor's account. (Plaintiff's Exhibit # 12 and # 18). There is no evidence to support the contention that $72,000 was transferred from the account of the Debtor to that of Howdeshell either just prior to or subsequent to the payment made to Dunham-Bush. This Court is satisfied that the payment wired to Dunham-Bush was from the accummulated funds of the parent company, Howdeshell.

When a creditor is paid from the funds of a third party, the Court must look to the source of control over the disposition of the funds to determine whether the payment is an avoidable preference. If the Debtor determines the disposition of the funds and designates the creditor to whom payment is made, it is clear that the funds are available for payment to creditors in general, and the funds are an asset of the estate. *Hargadon v. Cove State Bank (In re Joseph N. Jaggers, Jr.),* 48 B.R. 33, 36 (Bankr.W.D.Tex.1985); *see also the Inter-State National Bank of Kansas City v. Luther (Matter of Garden Grain & Seed Company, Inc.),* 221 F.2d 382, 393 (10th Cir.1955). In this case, it is clear that the Debtor had absolute control over the designation of the creditors to be paid. It was in the Debtor's interest to pay Dunham-Bush so that the project could be completed, not in Howdeshell's interest, and there was nothing in the record to suggest that the loan from Howdeshell, Inc. was condi-

tioned on the payment of that particular creditor. In fact, the record reflects that the intent was to pay Dunham-Bush from the proceeds of the Howdeshells personal loan. It was apparently more expeditious to make the Dunham-Bush payment from the parent company fund and use the personal loan to make payments to creditors in general rather than vice-versa. Based on the foregoing, the Court is satisfied that the fund, in the amount of $75,254.47 used to make the second payment is an asset of the estate.

■ The Defendant then seeks to avoid the Debtor's attack on these payments as preferential by asserting that these were payments in the ordinary course of business and, in any event, they were intended to be contemporaneous exchanges for new value and were, in fact, substantially contemporaneous. Of course, both of these defenses, if established, would defeat the Defendant's claim for relief by virtue of § 547(c)(1)(A)(3) and § 547(c)(2)(A), (B)(C). There is nothing in this record which would warrant the finding that the payments were contemporaneous exchanges. The equipment and services in question were clearly sold on open account and the transactions were neither intended to be contemporaneous exchanges nor were they, in fact, substantially contemporaneous. The fact that the Defendant refused to perform the start-up work would not render the transaction a "contemporaneous exchange." *In re Wadsworth Building Components, Inc.*, 711 F.2d. 122, 124 (9th Cir.1983); *see also Goger v. Cudahy Foods Company (In Re Standard Food Services)*, 723 F.2d. 820–21 (11th Cir.1984).

This leaves for consideration the claim of Dunham-Bush that after having received the payments it performed additional start-up work representing a value of approximately $4,000 and, therefore, it is entitled a credit. This contention is correct and Dunham-Bush shall be granted a credit of $4,000 for the value of the start-up work.

Based on the foregoing, this Court is satisfied that both the May 31, 1983 payment in the amount of $12,037.28 and the June 7, 1983 payment in the amount of $75,254.47 were preferences avoidable under § 547 of the Bankruptcy Code. The Debtor is, therefore, entitled to avoid the preferences and recover the payments in the total amount of $83,291.75 from Dunham-Bush less the sum of $4,000 representing new value.

A separate final judgment will be entered in accordance with the foregoing.